ADAM B. WOLF (Cal. Bar No. 215914)
TRACEY B. COWAN (Cal. Bar No. 250053)
PEIFFER ROSCA WOLF ABDULLAH
CARR & KANE, A PROFESSIONAL LAW
CORPORATION
4 Embarcadero Center, Suite 1400
San Francisco, CA  94111
Telephone: (415) 766-3545
Facsimile: (415) 402-0058
awolf@prwlegal.com
tcowan@prwlegal.com

*Attorneys for Plaintiffs and the putative class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Megan Bauer and Jonathan Bauer, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PACIFIC FERTILITY CENTER; PRELUDE FERTILITY, INC.; DOES 1-10, inclusive,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>(1) BREACH OF CONTRACT<br>(2) NEGLIGENCE<br>(3) CONVERSION<br><br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.     Plaintiffs Megan Bauer and Jonathan Bauer, on behalf of themselves and all other similarly situated individuals, file this action against Defendants Pacific Fertility Center ("Pacific"); Prelude Fertility, Inc. ("Prelude"); and Does 1-10 (collectively, "Defendants"). Plaintiffs were Defendants' clients for more than three years.  During that time, they entrusted Defendants with their dreams of having children, as well as their most sensitive and important property: their frozen embryos.

2.     This case concerns Defendants' squashing Plaintiffs' dreams of becoming parents when Defendants destroyed Plaintiffs' embryos.

3.     Defendants promised to safeguard and protect Plaintiffs' frozen embryos, vouching to maximize Plaintiffs' chances of becoming pregnant and Plaintiffs' opportunity to raise as many children as they would like.  Despite their agreement to maintain this position of extreme trust and fidelity and despite having charged Plaintiffs for storage of their frozen embryos for three years, Defendants recklessly, negligently, and/or knowingly destroyed Plaintiffs' embryos by allowing the liquid nitrogen levels in the cryo-storage tank where the embryos were stored to dip below acceptable and necessary levels.  As a result, Plaintiffs' embryos, as well as their dreams of future children, were irrevocably destroyed.

4.     Plaintiffs bring this action against Defendants for breach of contract, negligence, and conversion. Plaintiffs seek relief on their own behalf, as well as on behalf of the other individuals whose biological material was destroyed without their consent by Defendants' conduct.

**PARTIES**

5.     Plaintiffs Megan Bauer and Jonathan Bauer are individuals who are now, and at all relevant times mentioned in this Complaint were, citizens of California.

6.     At all times relevant herein, Defendant Pacific is a private unincorporated entity located at 55 Francisco Street, Suite 500, San Francisco, California 94133

7.     At all times relevant herein, Defendant Prelude was a Delaware corporation, organized and existing under the laws of the State of Delaware, with its principal place of

business in Florida.  Prelude, which began operations in October 2016, runs a nationwide network of fertility clinics, including Defendant Pacific.

8.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants sued herein as DOES 1 thought 10, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names.  Plaintiffs are informed and believe, and thereon allege, that each of said fictitious Defendants caused injury and damages to Plaintiffs.

9.     At all times relevant herein, Defendant DOES 1-10, and each of them, were and are Pacific and Prelude agents or employees, including but not limited to administrative personnel, scientists, technicians, and people who worked in reproductive technology to provide services to members of the public, including to Plaintiffs.

10.    At all times relevant herein, each of the Defendants was the agent or employee of the remaining Defendants.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (a) Plaintiffs are citizens of a state different from Prelude; (b) the amount in controversy exceeds $5,000,000, excluding interest and costs; (c) the proposed class consists of more than 100 individuals; and (d) none of the exceptions under the subsection applies in this action.

12.    This Court has personal jurisdiction over Defendants because Defendants are residents of and/or conduct a substantial amount of business in the District.  They have intentionally availed themselves of the laws and markets of this District.  A significant portion of the acts and omissions complained of occurred in the District, and Plaintiffs and many class members suffered harm in the District.

13.    Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in San Francisco County.

CLASS ACTION COMPLAINT; Case No:

## INTRADISTRICT ASSIGNMENT

14.    Assignment to the San Francisco Division is proper under Local Rule 3-2(c) because a substantial party of the events or omissions giving rise to the claims occurred in San Francisco County.

## STATEMENT OF FACTS

15.    Plaintiffs are a married couple.  Throughout their courtship, they both agreed that having children together was one of their most cherished dreams.  To that end, when the couple were married, they began trying to conceive.  Sadly, they were not successful.  Doctors found no medical reasons for their infertility.  After several years of failed attempts at natural conception, Plaintiffs decided to seek medical assistance.

16.    Many years ago, Plaintiffs began investigating artificial reproductive techniques, ultimately deciding to go through a cycle of in vitro fertilization (IVF).

17.    IVF is an invasive and technical process, involving multiple surgical procedures, laboratory fertilization and manipulation, and an intense drug regimen.  The first step for IVF involves several weeks of drug therapy designed to hyper-stimulate the woman's reproductive system into producing multiple eggs as part of her monthly cycle.  These eggs are harvested surgically and then fertilized with sperm in a laboratory.  Once the eggs have been fertilized into embryos, they are cultured for 2-6 days in a growth medium.  At that point, the embryos are either cryo-preserved for later use, or if a fresh transfer is desired, they are then transferred directly into the woman's uterus.

18.    IVF is most successful when the eggs used in the egg transfer are extracted from a woman before she is 38 years of age.  Rates of successful pregnancies improve dramatically when the eggs used are donated by younger women.

19.    During the process of cryopreservation, fertilized eggs, or pre-embryos, are preserved for future use.  The fertilized eggs are first treated with a solution to protect them from damage during freezing.  They are then cooled to a temperature of minus-sixty to minus-eighty degrees centigrade and placed in liquid nitrogen for long-term storage. Defendants use a rapid freezing process called vitrification.  Once thawed, the undamaged, fertilized eggs can

be transferred into the uterus.

20.     It is imperative that eggs be extracted while the woman is young enough to have a high probability of producing the greatest possible number of viable eggs.  Moreover, eggs from younger women typically have fewer abnormalities and genetic defects than eggs from older women.

**A.  Prelude and Pacific**

21.     Defendants Pacific and Prelude market and provide intrauterine insemination (IUI), IVF, genetic testing, and egg and embryo freezing, storage, and donation services.  On September 25, 2017, Prelude announced its acquisition of Pacific.

22.     On its website, Prelude emphasizes the safety of its egg-storage services.  Prelude directs those who visit its website to Pacific for egg and embryo freezing services, specifying that its "services" are available in San Francisco via Pacific.

23.     In turn, Pacific promises prospective clients that its egg and embryo freezing services "can increase your chances of conception by 5 to 10 times."  Pacific further represents that its customers' "[e]ggs remain frozen until you need them" and claims that its techniques result in survival rates after thawing that are consistently above 90%.

24.     One cycle of freezing and retrieval at Pacific, including storage for a year, costs nearly $10,000. A second cycle almost as much. Additional costs arise from other of Pacific Fertility's services, such as new patient consultations, lab work, and continuing tissue storage, as well as from needed medications. Pacific Fertility charges an annual fee of $600 for storing eggs and embryos.

**B.  Plaintiffs' Retrieval and Storage**

25.     IVF is typically an expensive and arduous process, subjecting prospective parents, including Plaintiffs, to both physical and emotional strain.  To prepare for the procedure, Plaintiff Megan Bauer attended numerous doctor appointments over the course of several months.  During these visits, she had to undergo multiple ultrasounds and blood tests, so that her doctor could determine when her body was ready to begin hormonal injections, as well as to determine her ovulation cycle.

26.     In order to increase her egg production, and thereby increase the chances for success, the first phase of the treatment involved the use of drugs to stimulate ovulation. The drugs were administered daily by needle for a little over two weeks, thereby stimulating the ovaries to increase egg production. During this time period, Megan had to go to Pacific's offices quite frequently for follow-up examinations and blood tests, which were used to calibrate her drug regimen.

27.     Added to this, the physical and emotional side effects of this hormone treatment were horrible. On direction from Pacific, Megan received multiple injections per day, in varying amounts. The shots were painful and caused unnatural stomach bloating and sharp mood swings. Megan felt like she was on an emotional rollercoaster during this time. The medications also subjected Megan to other risks, including the possibility of kidney failure, twisting of the ovary, ovarian rupture, and electrolyte problems that could require hospitalization. The cost of the medications was substantial.

28.     On the day of the egg retrieval surgery, Megan's physician extracted eggs from Megan. The eggs were fertilized with Jonathan's sperm in Pacific's laboratory. After fertilization and maturation to blastocyst, numerous viable embryos remained.

29.     Plaintiffs incurred substantial costs as a result of their fertility treatments at Pacific.

**C.  The Loss**

30.     Plaintiffs were planning to schedule a transfer of one or more of their embryos in April 2018. In the meantime, Defendants stored Plaintiffs' embryos—along with thousands of other embryos and eggs—in a cryo-storage tank, Tank No. 4, at Pacific's laboratory. Plaintiffs paid $600 a year for the storage of their 8 embryos.

31.     However, in March 2018, Plaintiffs received devastating news. Pacific emailed them a notice informing them that their stored tissue "*may* have been impacted" when the liquid nitrogen in Tank No. 4 fell below necessary levels (the "Loss"). The e-mail continued: "We are incredibly sorry that this happened and for the anxiety that this will surely cause. We are heartbroken by this situation and our thoughts are with each of you who may have been touched by this event." Plaintiffs are informed and believe that several hundred other Pacific clients

1  received the same email.

2      32.    When Plaintiffs read this notice, they were in shock.  They then reached out to

3  Pacific, who confirmed that Plaintiffs' embryos were indeed impacted during the Loss. Plaintiffs

4  were overwhelmed with grief when the truth sunk in that their embryos were gone.

5      33.    On information and belief, there was a leak in the seal on Tank No. 4.  Regardless

6  of what caused the drop in the liquid nitrogen levels, the resulting rise in temperature in Tank No.

7  4 destroyed Plaintiffs' embryos.  If Pacific had had an adequately-operating monitoring system to

8  catch the rising temperature, that system would have alerted Pacific's staff to address the problem

9  before the embryos and eggs in storage were irrevocably destroyed.  That did not happen.

10     34.    Plaintiffs are deeply distraught and traumatized over their loss.  They feel like their

11  dreams of having children together in the near future have been stolen from them.

12     35.    Plaintiffs are informed and believe that the destruction of their embryos was due

13  to the reckless, negligent, and/or knowing conduct of Defendants.  They furthermore are

14  informed and believe and thereupon allege that Defendants' preservation procedures were

15  obviously insufficient to guard against the risk of improper loss and destruction of cryo-

16  preserved materials in violation of their express wishes.

17     36.    Plaintiffs complain herein regarding Defendants' misconduct associated with

18  Defendants' preservation of their embryos—more specifically, the unauthorized destruction of

19  their embryos.  They do not complain about the egg harvesting, fertilization, or any other

20  potentially medical—or health-related—activity, which are separate procedures and distinct

21  from Defendants' storage of Plaintiffs' fertilized eggs.

22     37.    As a result of Defendants' destruction of Plaintiffs' embryos, they have lost

23  irreplaceable and highly valuable property.  Their damages stem from this loss of precious

24  property.  Plaintiffs viewed the embryos as their future children. They have suffered extreme

25  emotional distress and grief regarding the loss of their embryos, the prospect of suffering the

26  extreme pain and extreme emotional distress from undergoing the process again (if they could

27  afford it), and the fact that they may now not be able to have children in the future.

28     38.    Plaintiffs' understandable and severe distress has impacted all facets of their

lives.  Although they continue to try and come to terms with their grief, they struggle with the immense pain of their loss.

39.   Megan is now many years older than she was when Plaintiffs began the IVF process.  The literature indicates that her chances for producing viable and strong eggs have substantially decreased over the intervening time.  Moreover, the financial and emotional costs of undergoing another painful and drawn-out IVF procedure, during which there is no guarantee that Megan will be able to produce strong and viable eggs for fertilization and transfer, are daunting.

## CLASS ACTION ALLEGATIONS

40.   Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of a class defined as follows: "All individuals whose biological tissue stored in Pacific Fertility Center's laboratory was destroyed or potentially destroyed without the individuals' consent in March 2018."

41.   This class excludes the following: Defendants, their affiliates and subsidiaries, and their officers, directors, partners, employees, and agents; class counsel, their immediate family members and employees of their firms; counsel for Defendants, their immediate family members, and employees of their firms; and judicial officers assigned to this case and their staffs and immediate family members.

42.   Numerosity.   The members of the class are so numerous that their individual joinder is impracticable.  There are hundreds of class members, whose names and addresses are readily available from Defendants' records.

43.   Existence and Predominance of Common Questions of Fact and Law.  This action involves common questions of law and fact that predominate over any questions affecting individual class members, including, without limitation:

        a.   Whether the March 2018 loss of liquid nitrogen in Pacific's cryo-storage tank resulted from Defendants' negligence or other wrongful conduct;

        b.   Whether Defendants failed to take adequate steps to monitor the levels of liquid nitrogen and temperatures in Pacific's cryo-storage tank;

c.  Whether Defendants failed to take adequate steps to ensure that the temperature in Pacific's cryo-storage tank stayed below a certain level;

d.  Whether Defendants, and each of them, owed Plaintiffs and other class members a duty of care to protect and safeguard their biological material;

e.  Whether Defendants, and each of them, breached their duties of care to Plaintiffs and other class members to protect and safeguard that biological material;

f.  Whether any of Defendants' breaches of duty were willful or knowing;

g.  Whether Defendants with supervisory responsibilities failed to supervise subordinate Defendants to ensure that these duties were not breached;

h.  Whether Defendants owed contractual duties to Plaintiffs and other class members;

i.  Whether Defendants breached those contractual duties by allowing the temperature to rise in Tank No. 4 in March 2018 and/or by failing to have adequate systems in place to catch the rise in temperature before it harmed Plaintiffs' and other class members' biological material; and

j.  Whether Plaintiffs and class members were harmed by Defendants' breaches.

44.  Typicality.  Plaintiffs' claims are typical of the other class members' claims because Plaintiffs and class members were subjected to the same wrongful conduct and damaged in the same way by having their biological material destroyed without their consent.

45.  Adequacy of Representation.  Plaintiffs are adequate class representatives.  Their interests do not conflict with the interests of the other class members they seek to represent.  They have retained counsel competent and experienced in embryo-related legal disputes, as well as in complex class action litigation, and they intend to prosecute this action vigorously.  Plaintiffs and their counsel will fairly and adequately pursue and protect the interests of the class.

46.  Superiority.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by

Plaintiff and the other class members are relatively small compared to the burden and expense that would be required to litigate these claims individually.  As a result, it would be impracticable for class members to seek redress individually.  Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### FIRST CAUSE OF ACTION – BREACH OF CONTRACT

47.     Plaintiffs incorporate all paragraphs by reference.

48.     Defendants entered into contracts with Plaintiffs and other class members, whereby Defendants promised to cryopreserve, store, and safeguard Plaintiffs' and other class members' biological material.

49.     Defendants' form contract provided, in relevant part, that "[e]ggs are stored in a tank of liquid nitrogen and maintained at low temperatures until utilized."  Further, "[a]t a later date, when pregnancy using the cryopreserved eggs is desired, the eggs are thawed and the remaining steps in IVF are resumed."

50.     Plaintiffs and other class members provided consideration for these services and upheld their end of the bargain by promptly paying all bills, including their annual storage fees.  Plaintiffs and class members performed all the terms and conditions required of them under the contracts.

51.     Based on the conduct described herein, included but not limited to the destruction of Plaintiffs' and class members' biological material and the failure to institute appropriate systems to avoid such destruction, Defendants breached their obligations under the contracts with Plaintiffs and class members.

52.     As a direct and proximate result of Defendants' breach of contract, Plaintiffs suffered severe emotional, physical, property, and economic damages in an amount to be proven at trial.  Megan underwent significant and traumatic physical privation in the pursuit of preserving her ability to have children.  The process of egg stimulation and retrieval—since rendered useless by Defendants—is painful, traumatic, and scary.  It involves weeks of injections, mood swings from hormone changes, uncomfortable bloating, weight gain, and submission to anesthesia during the actual procedure.  When Defendants destroyed Plaintiffs' embryos, it rendered completely needless all of this pain that Megan went through.  It must compensate her for that pain and suffering, as well as for the Plaintiffs' property, economic, and other emotional damages.

53.     Plaintiffs and class members are entitled to recover all such damages as a result of Defendants' breach of contract.

## SECOND CAUSE OF ACTION –
## NEGLIGENCE and/or GROSS NEGLIGENCE

54.     Plaintiffs incorporate all paragraphs by reference.

55.     Defendants had a duty to exercise the highest degree of care in the storage and maintenance of the Plaintiffs' cryopreserved embryos, including the maintenance, inspection, monitoring, and testing of the liquid nitrogen in the cryo-preservation storage tanks used in Defendants' facilities.  Defendants furthermore had a duty to impose reasonable policies and procedures to ensure that Plaintiffs' and class members' biological material was properly stored and maintained.

56.     Defendants furthermore have a duty of care based on the fact that they voluntarily undertook to render cryopreservation and storage services to the Plaintiffs, and therefore had a duty to perform these services with a reasonable degree of care.  Defendants furthermore knew or should have known that failure to exercise such care increased the risk of harm to Plaintiffs.  Moreover, to the extent that Pacific's undertaking to store the material constitutes a bailment for hire, which is hereby alleged, Defendants had a duty of care with respect to the bailed property.

57.   Defendants Pacific and Prelude had a basic duty and a duty based on voluntarily undertaking to oversee and render cryopreservation and storage services to the Plaintiffs, and therefore had a duty to perform these services with the appropriate degree of care.  These defendants furthermore knew or should have known that failure to exercise such care increased the risk of harm to the Plaintiffs.

58.   Under the doctrine of voluntary undertaking, Does 1-10 similarly had a duty to render cryo-preservation and storage services to the Plaintiffs, on Defendant Pacific and Defendant Prelude's behalf, in a competent manner with an appropriate degree of care.  Does 1-10 furthermore knew or should have known that failure to exercise such care increased the risk of harm to the Plaintiffs.

59.   Plaintiffs relied on all of Defendants' aforementioned duties of care in placing their fertilized eggs in Defendants' care.

60.   Defendants breached these duties and acted with negligence and gross negligence in at least the following ways:

a.   Failing to adequately maintain, inspect, monitor, and/or test the liquid nitrogen levels in storage Tank No. 4, in accordance with industry standards, including through a functional electronic tank monitoring system capable of detecting a rise in temperature or a drop in the liquid nitrogen level and promptly alerting staff to the problem;

b.   Permitting a leakage or other failure to occur from one of their storage tanks containing human biological material;

c.   Failing to properly safeguard the human biological material in their care; and

d.   Failing to follow accepted scientific and laboratory procedures for safeguarding the human biological material in their care.

61.   Defendants' acts and omissions constitute gross negligence because they constitute an extreme departure from what a reasonably careful person would do in the same situation to prevent foreseeable loss of human biological material.

62.     Defendants acted willfully, wantonly, and with conscious and reckless disregard for the rights and interests of Plaintiffs and class members.  Defendants' acts and omissions had a great probability of causing significant harm and did cause such harm.

63.     As a direct and proximate result of Defendants' negligence, Plaintiffs and class members suffered, as a direct victim, extreme emotional, physical, property, and economic damages in an amount to be proven at trial.

64.     Plaintiffs and class members are entitled to recover all such damages as a result of Defendants' negligence.

### THIRD CAUSE OF ACTION – CONVERSION

65.     Plaintiffs incorporate all paragraphs by reference.

66.     Plaintiffs and class members owned their biological material, which were placed in Defendants' care for the express purpose of safekeeping and storage until such a time as Plaintiffs directed otherwise.

67.     As described above, Defendants converted the material by assuming control over them and knowingly destroying or otherwise improperly disposing of them irrevocably, thereby depriving Plaintiffs of their ownership rights over the property.

68.     As a direct and proximate result of Defendants' misconduct, Plaintiffs and class members suffered severe emotional, physical, property, and economic damages in an amount to be proven at trial.

69.     Plaintiffs and class members are entitled to recover all such damages as a result of Defendants' conversion.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief and judgment as follows:

(a)     Compensatory, rescissory, general, consequential, punitive, exemplary, and property damages in an amount to be proven at trial;

(b)     Emotional damages in an amount to be proven at trial;

(c)     Appropriate equitable relief;

(d)     Pre-judgement interest as permitted by law;

(e)     Costs of suit; and

(f)     Such further relief as this Court deems equitable, just, and proper.


Date: March 15, 2018                    Respectfully submitted,



                                        s/ Adam B. Wolf
                                        _____
                                        ADAM B. WOLF (Cal. Bar No. 215914)
                                        TRACEY B. COWAN (Cal. Bar No. 250053)
                                        PEIFFER ROSCA WOLF ABDULLAH
                                        CARR & KANE, A PROFESSIONAL LAW
                                        CORPORATION
                                        4 Embarcadero Center, Suite 1400
                                        San Francisco, CA  94111
                                        Telephone: (415) 766-3545
                                        Facsimile: (415) 402-0058
                                        awolf@prwlegal.com
                                        tcowan@prwlegal.com

CLASS ACTION COMPLAINT; Case No:

1

## DEMAND FOR JURY TRIAL

2

    Plaintiffs hereby demand a jury trial of all causes of action so triable.

3

4

Date: March 15, 2018         Respectfully submitted,

5

6

              *s/* Adam B. Wolf

7

              ADAM B. WOLF (Cal. Bar No. 215914)
              TRACEY B. COWAN (Cal. Bar No. 250053)

8

              PEIFFER ROSCA WOLF ABDULLAH
              CARR & KANE, A PROFESSIONAL LAW

9

              CORPORATION

10

              4 Embarcadero Center, Suite 1400
              San Francisco, CA  94111

11

              Telephone: (415) 766-3545
              Facsimile: (415) 402-0058

12

              awolf@prwlegal.com
              tcowan@prwlegal.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT; Case No: